Mike TAYLOR *v.* Nathan GEORGE

CA 04-1173                                    212 S.W.3d 17

Court of Appeals of Arkansas
Opinion delivered September 7, 2005

*Jesse B. Daggett*, for appellant.

*Raymond R. Abramson*, for appellee.

TERRY CRABTREE, Judge. This appeal is from an order of the Phillips County Circuit Court awarding judgment to appellee Nathan George for a small portion of the damages he sought against Mike Taylor for breach of a 2002 agricultural-service contract. Taylor has appealed from this award to George, and George has filed a cross-appeal seeking more damages and attorney's fees. On direct appeal, we reverse the trial court's award of damages to George for breach of the parties' 2002 contract. Because Taylor has not appealed from an award to George regarding a separate agreement in 2001, we affirm that aspect of the decision and modify the judgment accordingly. We affirm on the cross-appeal.

Taylor is a farmer, and George is a custom cotton harvester. For several years prior to the fall harvest of 2002, George harvested at least a portion of Taylor's cotton crop. The parties agree that they entered into an oral contract for George to harvest all 1100 acres of Taylor's 2002 crop. They disagree, however, about when George was required to begin performance. According to Taylor, George was to begin harvesting his crop when it matured, which usually occurred the last week of September or the first week of October. George, however, maintains that he was not required to begin harvesting Taylor's crop until after he had finished harvesting a 2000-acre cotton crop for another farmer, Glen Kale. For many years, George harvested Kale's crop before he harvested Taylor's crop; this was possible because, in the past, Kale's cotton matured a few weeks earlier than Taylor's cotton, usually in early September.

In 2002, George's three 1993-model John Deere four-row, single-wheel cotton pickers, which lacked rear-wheel assists, were in need of extensive repairs. Before the 2002 harvest season, George hired a cotton-picker technician, Chuck Watkins, to overhaul the pickers, spending approximately $67,660, which George borrowed from his bank. George also performed some of the repairs himself. According to George, he entered into this debt for the overhaul of the pickers in reliance on Taylor's promise that he could harvest all of Taylor's crop. Taylor disputes this.

In 2002, Kale's cotton matured late, and George did not begin harvesting Kale's cotton until September 30. Taylor's cotton, however, matured at its usual time in late September. Around October 1, Taylor's son, Mike Taylor, Jr., came to see George in one of Kale's fields and told George that Taylor's cotton was ready for harvest and that, because the rainy weather was predicted to worsen, he had made arrangements to borrow a picker from the Christines, who were friends of the Taylors, and would begin harvesting with that picker. Taylor used the Christines' picker about a week and, with it, was able to harvest approximately 200 acres of his cotton. The rainy weather continued, and, while George was still harvesting Kale's cotton, Taylor leased a six-row John Deere picker with rear-wheel assists from a local equipment dealer, obtaining the dealer's permission to return that picker whenever George was able to help Taylor. Because of the steady rains, Taylor could not begin harvesting his crop with the leased picker until a week or so later. George learned that Taylor had leased this picker and contacted Taylor, who acknowledged that he had leased the picker to harvest as much of his crop as possible until George could arrive to complete the harvest. During this period of time, Mike, Jr., stayed in contact with George by telephone, each advising the other of the progress they were making in harvesting the crops. The weather remained rainy, and the fields were extremely muddy. When most of his crop had been harvested, Taylor borrowed from his friends, the Carnathans, some harvesting equipment that was capable of functioning in muddy conditions.

In early November, Alan Evans asked George to harvest his 900 acres of cotton. Without first contacting Taylor, George declined the offer. George completed his harvest of Kale's crop on November 11 and called Taylor to let him know that he would be at Taylor's farm the next day. Taylor then told George that his harvest would be complete the next day and there was, therefore, no need in George's coming. When George called Evans back about his offer, Evans had already made other arrangements.

On April 11, 2003, George sued Taylor for breach of contract, for which he sought $110,000; promissory estoppel, for which he sought $90,000 for the overhaul of his cotton pickers; and $12,500 that Taylor allegedly owed him for the harvest of 2001. In his answer, Taylor asserted that George was not ready, willing, and able to pick his 2002 crop in a timely manner and stated that he had received no bill for the balance due for 2001.

Taylor argued that the parties' agreement was based upon the expectation that George would harvest the crop in a timely manner and that he could make other arrangements if George was unable to perform. He also said that he had taken the necessary steps to harvest his crop because George was "bogged down in the fields of Glen Kale due to the wet weather." Taylor asserted that George's inability to timely harvest his crop excused Taylor's performance of the contract. In an amended answer, Taylor asserted that he had mitigated his damages by harvesting his own crop and that any expenses he incurred in doing so should be set off against any damages that George might recover. He also contended that George had a duty to mitigate his own damages by accepting other work once he knew that Taylor was harvesting his own crop, and that George failed to do so.

At trial, Taylor paid George for the amount due on the 2001 contract. George testified on his own behalf and offered the testimony of Chuck Watkins, Alan Evans, Glen Kale, Julie Aydelotte (his accountant), and Danny Moser (his banker). Taylor testified on his own behalf and presented the testimony of Robert Lee (his accountant), Ed Whatley (an agricultural entomologist), Chris Carnathan (a farmer), Harry Stevens (a farmer), Mike, Jr., and George.

In a February 6, 2004 letter opinion, the circuit judge found that the parties imposed no deadline for George to start harvesting Taylor's crop or any restrictions against the possibility of adverse weather conditions. The judge stated:

> Based upon ... the ... testimony provided the court finds that an open-end start date would not be reasonable term of agricultural contract. The court does not find that the Defendant entered into a contract containing a term of that nature. As testified, time of picking cotton is an important consideration to a farmer and harvester. While an exact date may not be agreed upon by the parties, in an [sic] verbal contract regarding crops, a reasonable time after maturity of the crops to commence harvest is a term and condition of the contract. As a general rule, Defendant's cotton matured after Plaintiff had finished with the Kale field's but not in 2002. Plaintiff was aware of the actions taken by the Defendant to ensure his crop was harvested in a timely fashion. Plaintiff was kept informed of this progress by the telephone conversation with Mike, Jr., Defendant's agent whom Plaintiff had dealt with in the past.

In one of these conversations, Plaintiff was specifically informed the Defendant had approximately 500 acres remaining to be picked. Plaintiff was thereafter offered the 900 Evans land and made no effort to check with Defendant about the status of Defendant's harvest. Defendant, on the other hand did not inform Plaintiff of the additional assistance provided by the Carnathans.

By borrowing the Christine picker, renting the 6 - row picker informing the Plaintiff of his actions, the Defendant was taking reasonable efforts to protect his crop and mitigate the potential loss. The use of the Carnathan picker was also an effort of similar nature however here the Defendant failed to inform Plaintiff of this step. Plaintiff testified, and the court finds this testimony credible, with this information he would have contacted Evans and obtained other work. However, due to the Defendant's failure to contact him, he did not have this option.

The Plaintiff is entitled to recover the profit, that would have been realized from picking the 200 acres, that the court find was picked by the Carnathan equipment.

On March 5, 2004, the circuit judge entered a judgment incorporating her letter opinion, finding that Taylor had not entered into a contract with an open-ended starting date because that would not be a reasonable term of an agricultural contract. She also found that the time of picking cotton is an important consideration to a farmer and that, in a verbal agreement without an exact date, a reasonable time after maturity of the crop is a term and condition of the contract. She awarded judgment to George in the amount of $7500 for the profit he would have realized from picking the 200 acres that was picked by the Carnathan equipment. George moved for an award of attorney's fees and for prejudgment interest on the amount that Taylor had paid him for the 2001 harvest on the first day of trial. He also moved for reconsideration of the amount awarded him, which the court granted, finding that George's profit should have been $13,152. The judge also granted his request for prejudgment interest but denied his request for attorney's fees. An amended judgment increasing George's damages award to $13,152, granting judgment in the amount of $929.60 for the 2001 prejudgment interest, and denying his request for attorney's fees, was entered on April 7, 2004. Both parties appealed from the decision. Taylor does not, however, dispute the award to George of $929.60 for prejudgment interest on the amount he paid George at trial for his work in 2001.

## Standard of Review

When reviewing a judgment entered by a circuit judge after a bench trial, we will not reverse unless we determine that the circuit judge erred as a matter of law or we decide that her findings are clearly against the preponderance of the evidence. *Vereen v. Hargrove*, 80 Ark. App. 385, 96 S.W.3d 762 (2003). We view the evidence in the light most favorable to the appellee, resolving all inferences in the appellee's favor. *Id.* Disputed facts and the determination of the credibility of witnesses are within the province of the circuit judge, sitting as the trier of fact. *Id.*

Taylor argues on appeal that the trial judge erred in awarding any damages to George because George breached the contract; that Taylor acted reasonably in mitigating his damages; and that George did not act reasonably in mitigating his own losses. He also contends that, even if damages to George were proper, the trial judge erred in failing to set off certain amounts and in calculating those damages. For his cross-appeal, George argues that the trial judge failed to enforce the parties' contract; erred in not awarding any damages on his promissory-estoppel claim; and abused her discretion in failing to award him attorney's fees. Logic requires us to first address George's enforcement-of-the-contract issue on his cross-appeal.

## The Terms of the Agreement

George contends that the trial judge erred in failing to enforce the parties' express contract — that he would harvest all of Taylor's cotton crop after he finished harvesting Kale's crop, whenever that occurred. He asserts that the trial judge erred in considering Taylor's "custom in the trade" defense (that, if necessary, he could hire another harvester) and in finding that the contract was silent as to the time of performance. Thus, he contends, he should have been awarded all of the profits he would have received if the contract had been performed ($73,949).

The controlling issue, therefore, is whether the trial judge's findings of fact about the terms of the contract are clearly against a preponderance of the evidence. Certainly, the parties' testimony differed about their recollections of the conversation by which they entered into this contract. George testified that, in August 2002, he asked Taylor if he wanted George to pick his cotton, and Taylor replied that he did. George stated that he told Taylor he could do so but that "Glen's cotton is first." He testified that he

told Taylor that, in order to pick his cotton, he would have to overhaul his pickers, to which Taylor responded: "Don't worry about it, you're going to pick every row of my cotton." George testified that they discussed the fact that Kale's cotton was maturing late and that he left the meeting with the understanding that he would pick Taylor's crop "as soon as [he] finished Glen Kale's crop."

Taylor, however, testified that the parties' 2002 contract was the same as their prior contracts; that it is important to pick the cotton when it is ready; and that, in the past, Kale's cotton matured two or three weeks before Taylor's, making it possible for George to finish picking Kale's cotton by the time Taylor's was ready, which was usually around the first of October. Taylor stated that he was counting on George to be there when his cotton was ready and that he had not agreed to an "open-ended" contract whereby he would wait on George indefinitely. He said: "It's Nathan's responsibility to be there when the cotton is ready. That's understood . . . . I expect him to bring whatever equipment, work whatever hours and do whatever is necessary to get to my field in a timely manner."

■ Whether the parties agreed that George was to begin work for Taylor only after he was through with his work for Kale, whenever that was, or when Taylor's crop was mature and ready to be harvested, was a question of fact for the trial judge to determine. *See Landmark Sav. Bank v. Weaver-Bailey Contractors, Inc.*, 22 Ark. App. 258, 739 S.W.2d 166 (1987); *Country Corner Food & Drug, Inc. v. Reiss*, 22 Ark. App. 222, 737 S.W.2d 672 (1987). Where the pivotal issue is the credibility of interested parties whose testimony is in direct conflict, we defer to the trial judge's judgment. *Estate of Sabbs v. Cole*, 57 Ark. App. 179, 944 S.W.2d 123 (1997). Additionally, the testimony of an interested party is taken as disputed as a matter of law. *Ester v. Nat'l Home Ctrs., Inc.*, 335 Ark. 356, 981 S.W.2d 91 (1998).

The trial judge apparently did not believe George's testimony that Taylor agreed that George could perform after harvesting Kale's crop, no matter how long it took. As the finder of fact, it is within the trial judge's province to believe or disbelieve the testimony of any witness. *Found. Telecomms., Inc. v. Moe Studio, Inc.*, 341 Ark. 231, 16 S.W.3d 531 (2000). The trial judge here found that Taylor did not agree to an "open-end[ed]" starting date but that the agreement contemplated that George would begin work

for Taylor within a reasonable time after Taylor's crop reached maturity. The evidence clearly demonstrated that, although in the past George had harvested Kale's crop first, he had also harvested Taylor's crop soon after it matured; in their prior dealings, George had not left Taylor's crop to rot in the field. A court may look to the conduct of the parties to determine their intent and to give substance to indefinite terms of a contract. *Joshua v. McBride*, 19 Ark. App. 31, 716 S.W.2d 215 (1986); *Welch v. Cooper*, 11 Ark. App. 263, 670 S.W.2d 454 (1984).

The rule is well established that, where there is no provision as to the time of the performance of the contract, the law implies that it must be performed within a reasonable time. *Excelsior Mining Co. v. Willson*, 206 Ark. 1029, 178 S.W.2d 252 (1944). What would be a reasonable time depends upon the intention of the parties at the time the contract was made, the facts and circumstances surrounding its making, or, in general, what was contemplated by the parties at the time. *Id.*; *see also Mo. Pac. R.R. Co. v. Evans,* 206 Ark. 20, 173 S.W.2d 1019 (1943).

Because we cannot say that the trial judge's finding of fact that George was obligated to harvest Taylor's crop within a reasonable time after it reached maturity was clearly against a preponderance of the evidence, we affirm on this issue.

### The Award to George

■   Returning to Taylor's direct appeal, the next question is whether George materially breached the contract. Although the trial judge did not expressly say that he did, it is apparent that she thought so. When performance of a duty under a contract is contemplated, any nonperformance of that duty is a breach. *Vereen v. Hargrove, supra.* As a general rule, the failure of one party to perform his contractual obligations releases the other party from his obligations. *Id.*; *accord Stocker v. Hall*, 269 Ark. 468, 602 S.W.2d 662 (1980); *Cummings v. Lord's Art Galleries*, 227 Ark. 972, 302 S.W.2d 792 (1957); *Kelley v. N. Ohio Co.*, 210 Ark. 355, 196 S.W.2d 235 (1946). "It is an elementary rule that a person who has himself broken a contract cannot recover on it." *Witherspoon v. Choctaw Culvert & Mach. Co.*, 56 F.2d 984, 988 (8th Cir. 1932). Forfeitures, however, are not favored in the law, and a relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the contract; for one party's obligation to perform to be

discharged, the other party's breach must be material. *Vereen v. Hargrove, supra.* An influential circumstance in the determination of the materiality of a failure fully to perform a contract is the extent to which the injured party will obtain the substantial benefit that he reasonably anticipated. *TXO Prod. Corp. v. Page Farms, Inc.,* 287 Ark. 304, 698 S.W.2d 791 (1985); *Vereen v. Hargrove, supra.*

Because George was not ready to perform until the last day of Taylor's harvest, and in light of the overwhelming evidence that it would have been disastrous for Taylor to leave the cotton in the field to deteriorate, especially in the rain, we hold that George's breach of the contract was material and that it relieved Taylor of any further obligation to George.

Taylor argues that the trial judge erred in awarding judgment to George for the profit he would have made from picking the 200 acres that Taylor harvested with the Carnathans' picker. The trial judge based this award on the fact that Taylor failed to notify George that he was borrowing the picker. She found that Taylor made reasonable efforts to mitigate his loss by borrowing the Christines' and the Carnathans' pickers and by renting the six-row picker. The doctrine of avoidable consequences limits the amount of recoverable damages in that a party cannot recover damages resulting from consequences that he could have reasonably avoided by reasonable care, effort or expenditure. *Bill C. Harris Constr. Co. v. Powers,* 262 Ark. 96, 554 S.W.2d 332 (1977); *Quality Truck Equip. Co. v. Layman,* 51 Ark. App. 195, 912 S.W.2d 18 (1995). One is required only to take such steps as may be taken at small expense or with reasonable exertion, and where the expense is so large as to make the requirement impractical, the doctrine has no application. *Enter. Sales Co. v. Barham,* 270 Ark. 544, 605 S.W.2d 458 (1980). Reasonable diligence and ordinary care are all that are required. *Id.* The burden of proving that a non-breaching party could have avoided some or all of the damages by acting prudently rests on the breaching party, not only on the question of causation of damages for failure to avoid harmful consequences, but also on the question of the amount of damage that might have been avoided. *See Bill C. Harris Constr. Co. v. Powers, supra.* In most cases, whether one acted reasonably in minimizing, mitigating, or avoiding damages is a question of fact. *Id.; Quality Truck Equip. Co. v. Layman, supra.*

We agree with Taylor that the trial judge erred in placing the burden on Taylor to notify George that he was borrowing the Carnathans' picker over a month after George materially breached

the contract and over a month after Mike, Jr., notified George that Taylor was going to begin harvesting his own crop. George's material breach of the contract released Taylor from any further obligation to him; thus, Mike, Jr.'s communications with George during October and early November about their progress were not necessary, and Taylor had no obligation to inform George that he was borrowing the Carnathans' picker. We therefore hold that the trial judge erred in making this award to George and reverse on this point. As discussed above, we modify the judgment for George to $929.60.

### *Promissory Estoppel*

George also argues on his cross-appeal that the trial judge erred in failing to award him $67,660.03 for the overhaul of his cotton pickers, which he claims was undertaken in reliance on Taylor's promise that he could harvest all of Taylor's 2002 cotton crop. The trial judge did not expressly deny this claim. However, in her first letter opinion, she noted that Chuck Watkins testified that the overhaul was necessary "in any event, prior to commencing custom harvesting that year."

Promissory estoppel may be a basis for recovery only when formal contractual elements do not exist. *Cmty. Bank of N. Ark. v. Tri-State Propane*, 89 Ark. App. 272, 203 S.W.3d 124 (2005). In this case, the parties did have a contract; therefore, a claim for promissory estoppel was not appropriate. We affirm on this issue.

### *Attorney's Fees*

George also asserts that he should have been awarded attorney's fees. We disagree. The trial judge was not required to award him any fees, and under the circumstances of this case, we do not believe that she abused her discretion in refusing to do so. Arkansas Code Annotated section 16-22-308 (Repl. 1999) provides that a reasonable attorney's fee may be awarded to the prevailing party in certain civil actions, including those for breach of contract. A trial judge is not required to award attorney's fees, and we usually recognize the superior perspective of the trial judge in determining whether to award them. *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000); *C&W Asset Acquisition, LLC v. Whittington*, 90 Ark. App. 213, 205 S.W.3d 157 (2005). Whether to award attorney's fees under this statute is a matter within the trial

judge's discretion, and her decision will not be reversed in the absence of an abuse of that discretion. *Vereen v. Hargrove, supra.* We find no such abuse here.

Affirmed as modified in part and reversed in part on direct appeal; affirmed on cross-appeal.

HART and BIRD, JJ., agree.